## JOHN L. BEVAN, ADMINISTRATOR,

### V.

## THE ATLANTA NATIONAL BANK.

*Negotiable Instruments— Note—Signature—Forgery—Evidence—Witnesses.*

1. Where a witness has testified in the usual way to the genuineness of a disputed signature, it is not proper, upon cross-examination, to submit to him others known to be genuine for comparison with it, and a statement to the jury of the difference between them as they may appear to him.

2.   The authorship of a writing may be shown by other circumstances than the likeness or unlikeness of a given handwriting to that of the alleged writer, such as a marked peculiarity in its spelling or style of composition characteristic of the alleged writer.

3.   In an action brought to recover upon a promissory note, the defense being that the name of one of the alleged signers thereof, a person deceased, was a forgery, this court holds as proper the exclusion of several questions sought to be asked certain witnesses upon cross-examination, touching the difference between signatures submitted, and others, as to the ownership by them of similar notes, and declines to interfere with the judgment for the plaintiff.

[Opinion filed June 12, 1891.]

IN ERROR to the Circuit Court of Logan County; the Hon. GEORGE W. HERDMAN, Judge, presiding.

Messrs. BEACH & HODNETT, for plaintiff in error.

First:   The notes and order signed by Mrs. Williams upon which the witnesses based their knowledge of her signature and which showed a peculiarity in spelling, were admissible. Brooks v. Tichbourne, 5 Exchequer, 590; 16 Central L. J. 102.

Second:   The admission in evidence of the conversation between the witness Foley and Mrs. Williams, was error.   2 Smith's Leading Cases, 1011; Thompson v. Drake, 32 Ala. 99.

Third:   The court erred in restricting the cross-examination of the witnesses.   Ray v. Bell, 24 Ill. 441; Faulk v. Kellums, 54 Ill. 188; Melvin et al. v. Hodges, 71 Ill. 422; Gitchell v. Ryan, 24 Ill. App. 372; First Greenleaf on Evidence, Sec. 446; Thompson on Trials, Vol. 1, Sec. 406 and 450; People v. Benson, 52 Cal. 380.

Fourth:   To entitle the plaintiff to recover, the plaintiff's case must be proven by a preponderance of the evidence. Failing to do so a verdict in favor of the plaintiff will be set aside.   Lincoln v. Stowell, 62 Ill. 84; Peaslee v. Glass, 61 Ill. 94; Boudreau v. Boudreau, 45 Ill. 480.

Messrs. F. L. CAPPS and BLINN & HOBLIT, for defendant in error.

The law of this State is that the genuineness of a signature can not be proved or disproved on the trial of a cause by comparing it with another signature not in the case, whether

Bevan v. Atlanta National Bank.

the signature sought to be compared with it is admitted to be genuine or not. Gitchell v. Ryan, 24 Ill. App. 375; Kernin v. Hill, 37 Ill. 209; Melvin v. Hodges, 71 Ill. 425; Massey v. Farmer's National Bank, 104 Ill. 333; Snow v. Wiggin, 19 Ill. App. 543.

The cross-examination of a witness must be confined to the issue on trial, and all evidence calculated to mislead the jury from the real issue should be excluded. Holloway v. Johnson, 23 Ill. App. 332; Hanchett v. Kimbark, 118 Ill. 128; 1 Greenleaf on Ev., Sec. 51-52; 1 Wharton on Ev., Sec. 29; 1 Best on Ev., Sec. 251; 1 Phillips on Ev., Sec. 748; Evans v. George, 80 Ill. 51.

PLEASANTS, J. This was an action of assumpsit against plaintiff in error upon a promissory note for $1,000, purporting to be signed by C. E. Pratt and Alice Williams, to which he pleaded the general issue sworn to. Verdict and judgment for plaintiff below for $1,087.90, motion for a new trial having been denied and exception thereto duly taken. The defense was that the name of decedent signed to the note was forged. Upon that question there was a conflict in the evidence which makes the finding conclusive. No complaint is made in respect to the instructions. Plaintiff in error relies for a reversal of the judgment upon the exclusion of evidence offered by him.

Several witnesses who testified to their knowledge of her handwriting and signature from seeing her sign other papers, and to their belief that the signature in question was genuine, had their attention called on cross-examination to certain notes, and were asked if they were not the papers from which their knowledge of her handwriting was derived; whether her name as signed to them was not spelled and written as Alliee (double e); whether the signature was or was not like that on the note in suit, and to state the difference, if any. To each of these questions objection was made and sustained.

The tendency of the proposed cross-examination was to rebut the evidence in chief—which was the usual and proper kind of proof of handwriting, namely, the opinion of witnesses acquainted with the party's hand through other specimens—

by a comparison of the signature in question with others known to be genuine. It is true that the comparison was to be made in the first instance by the witness, and the difference between the writings compared, as they appeared to him, was then to be stated by him to the jury, but the result or effect was the same in kind as of a direct submission of the papers to the jury for their inspection and comparison. And that such was the object and purpose of the proposed cross-examination, we think, appears on its face, and by the offer of the papers themselves, which was made by the counsel and refused by the court.

It is said that the propriety of the excluded questions is shown by the case of Melvin v. Hodges, 71 Ill. 422. That was a suit upon a note, in which the defendant denied the genuineness of the signature. He called a witness who testified in chief that he was well acquainted with Melvin, had gone to school with him in Tennessee, had seen him write often, was well acquainted with his writing when young, was absent from him for eighteen years, had known him and seen him write during the last four years, and would not take the signature to the note to be his handwriting. The court then permitted him, at the instance of plaintiff, to examine Melvin's signature to the plea, which was admitted to be genuine, "as a basis for testing the accuracy of his observation and memory." For that purpose the Supreme Court say it was proper; that it was "not to prove a signature by comparison, but to test the accuracy of the witness' memory;" and that "the only effect the examination could have would be to enable the witness to determine how accurate and reliable was the impression of Melvin's signature, as fixed in his memory, with the views of confirming or modifying his previously expressed opinion in regard to the signature in controversy."

There the witness had been familiar with the party's writing many years before, but his recent opportunities had been slight. His opinion was founded mainly on his memory of those he had when they were boys together, and he did not state it as very positive or clear. He was permitted to look

at a recent signature, presumably near enough in date to that of the one in question to be marked by the same characteristics, and then say whether he would adhere to or modify the opinion he had previously expressed and which was based on recollection of what he knew in his boyhood about the party's handwriting—a thing that undergoes more or less of change with the lapse of time.   Certainly this was not a comparison, even in the mind of the witness, between the signature in question and another to prove or disprove the genuineness of the former; but a comparison of the latter with still other writings of the same party as he remembered them after many years, for the sole purpose of having him determine how far he could rely on that remembrance as the ground of an opinion upon the genuineness of any recent writing said to be Melvin's but disputed.   He was not asked to give the jury any means or data for any comparison by them of the writing in question with any other.   The sole object and effect was to test the reliability of the opinion he had stated, and to modify or confirm it as the test should require.

In the case at bar the object and effect of the questions excluded was, so far as related to the witnesses, to compel a retraction of their opinion that the disputed signature was genuine by a comparison of *it* with others that were known to be genuine, but claimed to be unlike it, and as related to the jury, to give them information of the differences, if any, and thus force a comparison by them.   We therefore think the authority cited is not in point.

But it was further claimed that the deceased habitually spelled her given name differently from the way it was spelled on the note in suit, and that to prove it the other notes referred to were admissible; citing Brooks v. Tichborne 5 Exchequer, 590; 16 Cent. Law Jour. 112; Pate v. The People, 3 Gilm. 644, 659.   In the first, which was an action on the case for libel, in charging the plaintiff with libel the writing in question contained the defendant's name, written " Titchborne;" and to prove the plaintiff wrote it, several letters which were written by him and showed the same misspelling

. of defendant's name were offered in evidence, but excluded; for which ruling a new trial was awarded. It was held that the habit of so misspelling the name was some evidence of the authorship of the disputed writing—its value depending on the degree of peculiarity of the misspelling and the number of occasions on which the party so misspelled it; that the habit might be shown by proof of oral misspelling as well, but where it was written, the writing was proper evidence of it.

It is not doubted that the authorship of a writing may be shown by other circumstances than the likeness or unlikeness of the handwriting to that of the alleged writer, as, a marked peculiarity in its spelling or style of composition characteristic of the alleged writer. Such a fact is as independent of its likeness or unlikeness to his handwriting as would be his admission of its authorship, though not so convincing; and proof of such fact may be made in any way that would be appropriate in other cases. Pate v. The People, which was an indictment for forgery, furnishes a good illustration. One of the papers the defendant was charged with forging was a receipt as follows:

"May 13th, 1844: I Hav Ths day Received of Alonzo Pate, fourteen Hundred dollars Being paid on a Track of land as witness my Hand and Seal," etc. Another was a contract for the conveyance of land, which was in the same general style. Suppose a dozen witnesses had testified that they were well acquainted with the defendant's handwriting, from sufficient means of knowledge, and believed those papers to be in it, could there be any question of his right, without denying their likeness to his writing, to introduce for the purpose of disproving his authorship of them, a hundred receipts and contracts written by him before and after May 13, 1844, in the usual course of his business as a conveyancer, and showing a perfectly correct spelling and correct use of words, capital letters and punctuation marks? And as the marked unlikeness in these respects would tend to disprove it, so a marked likeness in peculiarities of spelling, using capitals and punctuation marks would tend to prove it, independently of

their likeness or unlikeness in others. The two cases cited may be authorities to that extent, but no further on this subject.

We think this was no such case. Here was no such characteristic habit or such marked peculiarity as would throw any light upon the question. The claim is that she habitually wrote her given name as " Alliee " (double e). The evidence, so far as received, is that sometimes she did and at others did not. Her name, as she pronounced it, was "Alice." She habitually misspelled it by using two letters "l." The note in suit was signed according to her habit in that particular. It was also phonetically right, and we can not believe she ever intended to write the last syllable without a sibillant letter to represent the sound she distinctly gave it; and, therefore, we infer that where the first of the last two letters had the appearance of an " e," it was by her intended for the letter "c," and so was not a case of misspelling, but simply of peculiarity in her formation of that letter in that connection. It hardly amounted to a peculiarity. That letter, in almost everybody's writing, is quite commonly so formed that but for the connection it would be taken for an " e." (The writer hereof notices it in each of the words " evidence," "received," " pronounced," " appearance " and " notices "—being all of those on the page he is writing in which it immediately precedes the letter " e ".) It is doubtless largely accidental, depending on the pen, ink or paper used, or other accidental condition, rather than the habit or purpose of the writer. But if it were such a peculiarity, that is, of the kind that is the subject of the comparison, which our law disallows, and is not an independent fact like a peculiar habit of spelling or phrasing, we think the ruling was proper.

Plaintiff's witnesses were asked, on cross-examination, whether they held any note purporting to be signed by Mrs. Williams and C. E. Pratt, in respect to which the genuineness of the signature of her name was disputed, or were interested in any bank that held such a note. One of them at least answered that he did hold such a note, while in the case of

others the questions were objected to, and the objection sustained.

It is not pretended that the holding of such a note or interest would have disqualified them. Their interest was not in the event of this suit, nor could the record be used in evidence for them or the bank in a suit upon such a note, but was at most in the question alone. Nor is it clear that it would have shown an interest in the question. Pratt was a son-in-law of Mrs. Williams, and lived on a farm adjoining hers. Their relations were very intimate. The notes referred to were separate and independent transactions. The holder of one might be in no way concerned about the question of the signature of her name to any other. The evidence of it, as to his, might be entirely different from that relied on as to them. As bearing upon the bias of the witness, if it had any, the evidence excluded was so uncertain and remote, and would have so tended to introduce collateral issues and improper prejudices one way or the other, that we think the court may be justified in keeping it out of the case.

The statement of her nephew, Judge Foley, of what she said about the likelihood of her losing anything by Pratt, while it did not touch the particular transaction here involved, in its connection tended to show the personal and business relations between her and him, which was proper, and could hardly have had any further effect upon the minds of the jurors.

Counsel make no point, in their brief or argument, upon the judgment as to costs, and therefore we have not noticed it. Perceiving no material error in the record the judgment will be affirmed.

*Judgment affirmed.*